[Crim. No. 3886.    Third Dist.    Jan. 3, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CHANDLER
J. WALKER, Defendant and Appellant.

William T. Sweigert, James P. Carroll, Lally, Martin, Chedlow & Viets and Thomas W. Martin for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Nelson Kempsky and Raymond M. Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Chandler J. Walker was convicted of three counts of perjury. (Pen. Code, § 118.) Pronouncement of judgment was suspended and probation granted. He properly appeals from the order granting probation.

The crucial question presented on this appeal is whether an oath was taken by Walker before a notary public with sufficient formality to permit a charge of perjury within the meaning of section 118 of the Penal Code.

We hold there were irregularities in the manner in which the notary administered the oath to Walker but that an oath was administered and that perjury was proved. Other points urged for reversal are without merit and the judgment should be affirmed. Explanation of our holding will follow a statement of the facts.

Walker was the former owner of the West Coast Construc-

tion Company, and as such he was in the home improvement business specializing in the sale of aluminum products. He employed salesmen whom he described as "independent contractors. These salesmen actually secured the orders.

Three sales by the Walker organization are involved in three counts of perjury prosecutions on which Walker was convicted. A discussion of one of these sales in detail will suffice for the purposes of this opinion.

This was a sale by these "independent contractors" to Willis Dunbar and his wife. They agreed to have aluminum siding and a roof and canopy placed on their home for the sum of $3,000. To their knowledge they signed only a credit report and a job authorization order. These were in the form of a printed pad with carbon paper inserted between counterparts. The salesman told the Dunbars that they would have to sign a third copy of the credit application because the carbon paper had not shown an impression of their signatures on the third counterpart. They did so, believing they were only signing the credit application. A work completion order was signed upon completion of the job. Dunbar testified that at no time did he sign a deed of trust; Mrs. Dunbar's testimony was similar to that of her husband's; and she too testified that she never knowingly signed a deed of trust. In fact the proposition that a deed of trust would be given had never been discussed.

A deed of trust was introduced signed by the Dunbars. It also included what was proved to be the signature of Walker "as witness." A form in the following language appears thereon: " [P]ersonally appeared Chandler J. Walker, personally known to me to be the person whose name is subscribed to the within Instrument, as a witness thereto, who being by me duly sworn deposes and says: That he resides in Sacramento and that he was present and saw Willis F. Dunbar & Lily B. Dunbar personally known to him to be the same persons described in and whose names are subscribed to the within Instrument as Buyers, execute and deliver the same, and said Buyers acknowledges [sic] to said affiant that they executed the same; and said affiant subscribed his name thereto as a Witness." This form was signed by Leonard C. Silvani, a notary public. The form is partially a printed form. The personalized portions were proved to have been written in by Walker who presented the instrument to Silvani to be notarized.

Walker, who testified in his own behalf, admitted that he

had not seen the Dunbars sign the deed of trust. His defense to the charge of perjury was that he was not under oath when he appeared before the notary.

Silvani, the notary, testified that Walker *was* under oath. In addition to being a notary, Silvani was engaged in the real estate mortgage business. He testified that Walker, periodically during the period when the transactions involved in the prosecution occurred, had called upon him to perform notarial duties. His testimony as to the manner in which he had administered the oath is equivocal. We have set forth material portions in a footnote.[1]

The evidence regarding the other charges is similar. It is unnecessary to discuss them in detail. The prosecution showed with reference to the charge involving other customers (Houston and Herise Brengettsey) that Walker had told a deputy district attorney that he had signed the deed of trust as a witness to their signatures but without actually having been present when they signed; that he had written up the certificate before presenting it to Silvani and had obtained

---

[1] On direct examination he testified: "Q. [D]id you swear him to the contents of that acknowledgment? . . . A. Yes. He was under oath, yes. Q. All right. So in essence, and correct me if I'm wrong, you asked Mr. Walker whether or not he had observed the Dunbars place their signatures to that document? A. Yes. Q. And he said, 'yes'? A. Yes. Q. And you asked him whether or not the contents of that acknowledgment were true, is that correct? A. I don't recall asking him. Q. To what you would swear him is true, is that correct (Mr. Railey [the prosecuting attorney] then raised his hand demonstrating to the witness what he meant)? A. Yes. Q. And what was his response to that? A. He replied yes. Q. All right, that's what I want to know. . . . Q. Altogether, approximately how many times . . . has Mr. Walker appeared before you and been sworn? . . . Q. That he observed the signatures of these trustors to these Deeds of Trust? A. I'd say several. I don't know exactly."

He testified on cross-examination when asked how he had administered the oath to Walker: "Well, there was nothing—nothing physical. I asked Mr. Walker, 'Did you witness that signatures'? And I mentioned the name of the trustors and he replied affirmatively and then I might add that in this inception when I first started notarizing documents for him that I told him at that time any documents notarized you had to be under oath to have them notarized. And maybe the format wasn't what it should be, but—he was under oath. There was no raising of the hand or anything. I asked him if he witnessed the signatures and he had."

Later he testified: ". . . I considered he was under oath, and he knew it."

In response to a question by the court: "[W]hen Mr. Walker came in to your office, did he raise his right hand and solemnly swear that the writing he was going to make was the truth, the whole truth and nothing but the truth, did he do that? A. Not in that terminology, no."

On redirect: "Q. . . . Now are you convinced that he understood he was swearing to the authenticity of those signatures? A. Yes. Q. Would you tell him? A. Would I tell him he was swearing to the authenticity? Q. Yes. A. I would tell him that."

Mr. Silvani's signature as the notary and that the notary's seal had been affixed. (He also stated that in all cases this procedure was for the purpose of making it possible for him to record the deeds of trust.)

As to his understanding about being under oath Walker had stated to the attorney: ''Q. And Mr. Silvani, did you appear before him personally at that time? A. Yes, I did. Q. And did he administer an oath? A. I would say so. Q. Yes. Now, had you really witnessed their signatures on this document? A. No I had not.''[2]

Government Code section 27287 provides in part here material: '' [B]efore an instrument can be recorded its execution shall be acknowledged by the person executing it . . . or proved by subscribing witness . . . and the acknowledgment of proof certified as prescribed by law.''

An ''acknowledgement'' is not here involved; there was a purported proof by a purported subscribing witness with a purported sworn certificate. Such proof, of course, under oath, with the notary's certificate is a prerequisite to recordation. (Gov. Code, § 27287, *supra*.) The evidence shows Walker knew this. It was his purpose to obtain a recordation of the deed of trust established to have been obtained fraudulently. The latter act is not that for which he was being prosecuted. This does not mean that knowledge of the necessity of an oath is unimportant.

Section 118 of the Penal Code provides in part that ''Every person who, having taken an oath that he will testify, declare, depose or certify truly before any competent . . . person, in any of the cases in which such an oath may by law be ad-

_____

[2]In his testimony at the trial Walker retracted this statement. After having admitted he had not actually witnessed any of the signatures on the deeds of trust he testified on direct eamination: ''Q. Do you recall the details on each time you went [before Silvani to have his proof of signature as witness notarized] on each particular one? A. No. Q. You don't recall any? A. I don't recall the details, no. . . . Q. Do you have any explanation as to why you appeared before Mr. Silvani and said that you witnessed the signatures when you weren't the one that did witness them; somebody else did. Do you have any explanation for the jury and the Court? A. Well, I treated it—this, prior to the first contact with the District Attorney's Office—I treated the deeds of trust in a rather careless and light fashion. . . .''

He later testified: ''Q. Well, if you don't recall—I mean, your testimony is you don't recall having transacted the notarization, so you couldn't recall as a basis where you admit you were sworn or administered an oath? The question is — [A colloquy between counsel and the court followed] Q. Mr. Walker, on any occasion did Mr. Silvani swear you in and did you take an oath on any of the notarizations involved in this proceeding, or at any time? A. No. Q. And I'm making reference to the raising of the hand and things like that? A. No.''

ministered, wilfully and contrary to such oath, states as true any material matter which he knows to be false . . . is guilty of perjury.''

■ A false statement pursuant to the proof or acknowledgment of an instrument before a notary public may be the basis of a charge of perjury. (*Ex parte Carpenter,* 64 Cal. 267 [30 P. 816]; Civ Code, § 1181; see also *People* v. *Teixeira,* 59 Cal.App. 598 [211 P. 470].) This rule, of course, applies to an oath administered by a notary on a proof by a subscribing witness.

■ To convict one of the crime of perjury in violation of Penal Code section 118 it must be proved that the defendant: (1) took an oath that he would testify, declare, depose or certify truly before (2) a competent tribunal or person (3) that such oath was taken in a case in which an oath may be lawfully administered, and (4) that the accused wilfully and contrary to such oath stated as true, a material fact which he knew was false. (*People* v. *Gilbert,* 217 Cal. App.2d 662, 666 [31 Cal.Rptr. 920]; *People* v. *Baranov,* 201 Cal.App.2d 52, 57-58 [19 Cal.Rptr. 866].)

The manner of administering an oath in "an action or proceeding" is carefully spelled out. (Code Civ. Proc., § 2094.) Singularly enough we find no special form prescribed for the administering of an oath when, as here, a party is certifying to his act of witnessing the signatures to an instrument in writing.

Section 121 of the Penal Code provides: "It is no defense to a prosecution for perjury that the oath was administered in an irregular manner. or that the person accused of perjury did not go before, or was not in the presence of, the officer purporting to administer the oath, if such accused caused or procured such officer to certify that the oath had been taken or administered."

Although no California authority applying this section has been cited by counsel (and we find none) with facts paralleling those of the case at bench, there *are* cases which assist us in determination of the problem presented.

In *Peters* v. *City & County of San Francisco,* 41 Cal.2d 419 [260 P.2d 55], our Supreme Court has stated (at p. 426): "The claim may be regarded as a 'verified' one within the meaning of the statute although plaintiff did not appear before a notary to sign the verification. (Cf. *Germ* v. *City & County of San Francisco,* 99 Cal.App.2d 404 [222 P.2d 122]

[involving an identical provision in the city charter].) The object of requiring verification is to hold the claimant responsible for any false statements made in the claim, and, as pointed out in the *Germ* case, it is no defense to a prosecution for perjury that the person accused of swearing falsely 'did not go before, or was not in the presence of, the officer purporting to administer the oath, if such accused caused or procured such officer to certify that the oath had been taken or administered.' (*Germ* v. *City & County of San Francisco*, 99 Cal.App.2d 404, 413-414 [222 P.2d 122]; Penal Code, § 121; see *People* v. *Darcy*, 59 Cal.App.2d 342 [139 P.2d 118].) It may be inferred from the evidence that plaintiff was aware that she was required to sign the verification under oath, and her attorney caused the notary to certify that plaintiff had sworn to the statement made in the claim. Accordingly, it appears that there has been substantial compliance with the statutory requirement of verification.''

The case before us shows, we think, closer compliance with the requirements of oath-administration than was present in *Peters, supra.*

In *People* v. *Brown,* 125 Cal.App.2d 83 [269 P.2d 918], it was held (at p. 88) that it was not necessary that the words ''oath,'' ''swear'' or ''depose'' be used. There evidence was given that defendant had raised his hand in making his statement. (Here Silvani had indicated on direct examination that Walker had raised his hand, but the weight of this testimony was, it must be recognized, lessened by his admission on cross-examination that ''there was nothing physical'' in the administering of the oath. Also when the court asked the compound and leading question, ''. . . did he raise his right hand and solemnly swear that the writing he was going to make [NB, that Walker had already *made* the writing] was the truth, the whole truth and nothing but the truth, did he do that?'' the answer was: ''Not in that terminology, no.'' Unexplored was the exact, or the gist of, the terminology which *was* used. (See footnote 1.)

In *People* v. *Darcy,* 59 Cal.App.2d 342 [139 P.2d 118], the court states (at p. 350): ''A person who, being required by law to make a statement under oath, willfully and knowingly falsifies such statement, purportedly made under oath, in any particular, is guilty of perjury as a matter of law whether or not the oath was in fact taken (sec. 129), . . . and the offense is complete upon delivery of the affidavit to another person, with the intent that it be uttered or published as true.''

Turning to other jurisdictions, we find cases with facts similar to the case before us.

In *State* v. *Anderson,* 178 Kan. 322 [285 P.2d 1073], a *deputy sheriff went before a county judge and as a result* of the statements he made a complaint was prepared. The complaint stated: "Duane Anderson being duly sworn, on oath says . . . ." After the complaint was prepared it was executed by the deputy and a warrant was issued and a party arrested. In the prosecution for perjury against the deputy, he claimed that he was not under oath, as the judge charged with administering the oath, signed the same in silence and without statements or questions to the deputy. There was at the time a Kansas statute requiring the laying of the right hand on the Holy Bible in the taking of an oath. The court said, however, ". . . it is common knowledge that such requirements are not always complied with strictly. The question is whether under the circumstances what was done was [a] . . . nullity." The court pointed out that the deputy read *the statement after the judge prepared it and further com-*mented: "Surely some weight must be given to opening statements of the complaint and to the physical acts of the party even though statutory formalities were not observed . . . ." The theory of the court was that there was nothing to show that there was a design by either the judge or Anderson to have Anderson "unsworn." Thus, silence did not outweigh the wording of the certificate and the actual signing in view of the fact that there was nothing from which it could be concluded that the party intended not to be sworn. In the case at bench Walker not only read the statement, *he had prepared it.*

There is a comprehensive note (as of 1927) in 51 American Law Reports 840 on cases covering the formalities required in the administering of oaths. The note is an annotation to a reported case, *Atwood* v. *State of Mississippi,* 146 Miss. 662 [111 So. 865, 51 A.L.R. 836]. There the questioned "oath" was administered by a justice of the peace to an affidavit for a search warrant. The officer did not require the affiant to hold up his hand to be sworn, nor was there formal oral administration of the oath; but as the opinion states (on p. 838 of 51 A.L.R.) "the evidence shows, without conflict, that both the affiant and the justice of the peace knew and realized that an oath was necessary before a search warrant could be obtained, and that they considered what was done at the time the oath was signed by the affiant and the warrant issued by

the justice of the peace to be sufficient in law to constitute an oath. . . . Both of them understood, without anything being said to that effect, that the affiant was making the necessary affidavit to obtain the search warrant.''

In the note in 51 American Law Reports 840 et seq. other authorities expressing rigid rules are cited as well as those stating liberal rules. ■■ We take the position that the California Legislature, by the provisions of Penal Code section 121, has committed this state to a liberal policy in ruling upon the question whether compliance with formalities in oath taking has been had. We pay willing obedience to that rule. The busy business world of today inevitably spawns informality in the performance of ceremonial functions, particularly those which are (at least in some respects) the vestiges of a more ritualistic era. We look, modernly, to substance more than form. In the field of law into which this case falls the manifested intent with which an act is done should weigh more heavily than the observance of punctiliousness in its ceremonial aspects. Symbolism should not be confused with solemnization. ■■ Here, although considerable doubt attends the testimony, both of the notary and of defendant Walker as to just what acts did occur when the ''proof'' was made and certified to, there is no question whatever about the following: (1) Walker himself prepared—wrote out—the very form which states, ''Chandler J. Walker . . . being by me duly sworn deposes and says . . .''; (2) Walker had the specific intent to make the statement as a sworn statement, and he was well aware that the instrument would be regarded as one sworn to—to the end that it could be placed of record; (3) he approached the notary to have the necessary form notarized; (4) he was informed by the notary to the effect that he, Walker, would be regarded as being under oath, and (5) both the notary and Walker regarded the latter as being under oath. ■■ ■■ ■■ We hold under the facts related there was sufficient substantial evidence before the jury, adequately instructed, to justify its implied finding that the formalities of oath taking had been complied with.[3]

---

[3]Even on the question as to whether there was actually a hand-raising ceremony there is conflict. Silvani's direct testimony that there was suffers by his statements on cross-examination, particularly his negative answer to the judge's question. (See footnote 1, *supra.*) But Walker acknowledged that on one occasion at least he had been sworn. Silvani testified there was a solemnization ceremony of some sort. Our code spells out no particular words which must be used; on the contrary it

Walker also contends that adverse publicity had a profound prejudicial effect upon the fairness of his trial. It is asserted that there was almost a daily front page feature story in the local press setting forth accusations made against "unethical practices in the aluminum siding industry."

The record does not show any motion for a change of venue made. ■■■ A defendant may not claim for the first time on appeal that he was deprived of a fair trial before an unbiased jury because of newspaper publicity where with full knowledge of the publicity he made no objection and failed to move for a change of venue. (*People* v. *Magee,* 217 Cal.App.2d 443 [31 Cal.Rptr. 658].) Moreover, there is no showing in this record either of the extent or scope of the adverse publicity or that it was impossible to secure an impartial trial.

Appellant claims that the prosecution inflamed the jury with reference to Walker and his salesmen as "suede shoe boys" and "aluminum siding racketeers." There is a reference to "suede shoe boys" in the argument by defense counsel on motion for a new trial. The district attorney's arguments to the jury are not in the record. We have no way of knowing whether the remarks were made; if made, whether they were objected to or in what context the statements were uttered. ■■■ An appellate court will not consider statements of error asserted in a brief which are not supported by the record. (*People* v. *Boyden,* 181 Cal.App.2d 48 [4 Cal.Rptr. 869]; *People* v. *Deriso,* 222 Cal.App.2d 478 [35 Cal.Rptr. 134].)

Moreover, perjury is a specific intent crime. (*People* v. *Guasti,* 110 Cal.App.2d 456, 464 [243 P.2d 59].) As we have shown, proof by the prosecution that Walker intentionally swore falsely to serve his nefarious purposes was an important factor in the state's case. There was overwhelming evidence that his purposes *were* iniquitous. ■■■ A prosecuting attorney may use appropriate epithets warranted by the evidence. (*People* v. *Mitchell,* 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211].) We see no reason to exclude such an epithet

condones informality. The weight to be accorded conflicting testimony is for the trier of fact. Where there is a conflict in the testimony a reviewing court does not reweigh; we do not have to be convinced of a fact necessary to establish guilt beyond a reasonable doubt; our inquiry ends when we find substantial evidence from which a jury reasonably could be so convinced. (*People* v. *Hall,* 62 Cal.2d 104, 109-110 [41 Cal.Rptr. 284, 396 P.2d 700]; *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].)

merely because it is one properly catalogued as being within the vulgate.

The purported appeal from the order denying the motion for new trial is dismissed. The order granting probation is affirmed.

Regan, J., concurred.

A petition for a rehearing was denied January 26, 1967, and appellant's petition for a hearing by the Supreme Court was denied February 28, 1967.