[Crim. No. 2735.    Fourth Dist., Div. Two.    Jan. 17, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. KENNETH RALPH RICHARDSON, Defendant and Appellant.

24

James Ensign, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, George J. Roth and Philippe J. Monet, Deputy Attorneys General, for Plaintiff and Respondent.

KERRIGAN, Acting P. J.—Following a jury trial, defendant was sentenced to state prison as a result of a judgment convicting him of the crime of assault with intent to commit murder (Pen. Code, § 217).

The victim, a young, married, pregnant girl in her early twenties, lived with her mother and 14-year-old sister in Palm Springs. During the mother's absence from the home on Sunday, April 3, 1966, the victim retired early, but her young sister, Karen, remained up to watch television. Between 10 :15-10 :20 p.m. defendant appeared and Karen answered the door. She recognized defendant as a painter who had done some work at the residence a few weeks earlier. Karen informed defendant that her mother was not at home when defendant inquired as to whether some sandblasting work was required. Thereupon, defendant forcibly entered the home, and Karen

fled to the victim's bedroom. Defendant followed Karen into the bedroom, and the victim awoke as a result of Karen's screams. Defendant struck the victim several times with an unknown object. While defendant was beating her older sister, Karen tried to run from the bedroom when defendant grabbed her and got down on top of her. Following the initial assault, the victim attempted to run from the bedroom, but defendant arose and pursued her. While defendant was chasing the victim, Karen ran outside, climbed the fence, proceeded to a neighbor's home, and called the police. When the officers arrived, they found the victim lying on her bed twisting, turning, and screaming in obvious agony. She sustained serious injuries as a result of the attack, consisting of lacerations, contusions, and abrasions of the head, concussion of the brain, lacerations of both hands, and a fracture of the right hand, which injuries were inflicted by a blunt instrument. The victim could not identify defendant as the assailant inasmuch as she suffered nearly complete amnesia as to all events following the original attack.

An investigating officer found a silver cigarette lighter lying on the sidewalk between the carport and front door of the home when he responded to the call for assistance. The inner part of the lighter was imprinted with defendant's right thumb print. Multiple bloodstains were discovered in the hallway and in the victim's bedroom.

The victim did not know the defendant except for possibly having seen him when he was engaged in painting the family residence a few weeks prior to the attack. However, on the day following the assault, the police authorities showed Karen photographs of various painters who had done work at the premises, and she identified the defendant as her sister's assailant.

Armed with an arrest warrant, the Palm Springs police arrested defendant at nearby Cabazon, California. Defendant was immediately advised: that he was a suspect; that he had a right to remain silent; that he did not have to answer any questions; that any statement he made could be used against him; and that he had the right to counsel. He was further offered the services of an attorney. Defendant replied that he did not desire an attorney. The officers requested permission to search defendant's residence, and he replied that he had no objection to a search. The officers and defendant then proceeded to his home at Beaumont, California, where the authorities found certain clothing which he stated he had worn the preceding Sunday evening, and the pants, shirt,

shoes and socks of the defendant were later analyzed by a criminalist. During the trial it was established that the victim's blood is type "O"; that the defendant's blood is type "A." Type "O" blood was found on defendant's shoes and socks.

Defendant took the stand in his own behalf and called witnesses for the purpose of establishing an alibi. Defendant testified that: on the morning of the crime he had done some painting; in the afternoon he attended a shuffleboard tournament at a Beaumont bar; later, he went to a friend's home in Banning; thereafter he visited the Desert Sands Poker Club at Cabazon and played cards until midnight; he then visited another bar; when the bar closed, he ate supper at Denny's Restaurant and then went to a girl's home where he stayed the rest of the night; the pants, shirt, shoes and socks removed from his room belonged to him; he had worn the pants and shirt on the night of the assault, but not the shoes and socks, although he originally told the officers that he had been wearing the shoes and socks that evening; and he did not have a cigarette lighter on April 3, 1966, although he had owned a lighter prior thereto.

Defendant called several witnesses, including the Cabazon Chief of Police, for the purpose of establishing an alibi. The defense witnesses confirmed the fact that the defendant had been present in the casino on the evening of the attack. However, the evidence was conflicting as to the precise time he arrived at the poker club, the time he remained there, and the hour he departed.

Defendant's attack on the judgment is predicated on the following grounds: (1) He was denied a fair trial because of unfair newspaper publicity; (2) the expert testimony that the defendant's fingerprint was impressed on the cigarette lighter was improperly admitted; (3) insufficient foundation for the introduction in evidence of photographs of the interior of the victim's residence; (4) the photographs were inflammatory and therefore improperly admitted; and (5) the evidence that defendant consented to a search of his residence was improperly admitted because the *Miranda* doctrine requires that an accused be informed that he has a right to refuse a search.

Attached to defendant's brief are copies of three news articles which appeared in separate editions of the Riverside Daily Enterprise, a paper of general circulation which is widely distributed in the Indio-Palm Springs desert area where the trial occurred. These newspaper accounts not only

reported the progress of the trial in this assault case, but also made reference to the fact that the defendant had been acquitted eight months previously in another criminal case involving the sex-slaying of an 8-year-old Beaumont child, and that a charge of burglary was still pending against the defendant in the West Covina area. However, the defendant did not raise the issue of possible prejudicial newspaper publicity at the trial level either in the form of an objection, motion for mistrial, or motion for change of venue.

Due process requires that an accused receive a fair trial by an impartial jury, free from outside influences. (*Sheppard* v. *Maxwell*, 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507, 1522].) Where there is a reasonable likelihood that adverse pretrial publicity will prevent a fair trial, the trial judge should continue the case until the threat abates or transfer it to another county not so permeated with such publicity. (*Sheppard* v. *Maxwell, supra.*) If publicity during proceedings threatens the fairness of the trial, a new trial should be ordered. (*Sheppard* v. *Maxwell, supra.*)

However, California law evinces a policy permitting acceptance of jurors who, after contact with pretrial news reports, commit themselves to impartiality and fairness. (*People* v. *Miller*, 245 Cal.App.2d 112, 159 [53 Cal.Rptr. 720]; *People* v. *Parker*, 235 Cal.App.2d 100, 105 [44 Cal.Rptr. 909].)

In the case under review, it should be initially noted that we are not confronted with *pretrial* but with *trial* publicity. The newspaper clippings, annexed to appellant's brief, were never called to the trial court's attention and are consequently matters outside the record. Ordinarily, a reviewing court will not consider statements of errors appearing in a brief which are unsupported by the record. (*People* v. *Walker*, 247 Cal.App.2d 554, 563 [55 Cal.Rptr. 726], cert. den. 389 U.S. 824 [19 L.Ed.2d 77, 88 S.Ct. 60]; *People* v. *Jackson*, 230 Cal.App.2d 485, 490 [41 Cal.Rptr. 113].) Assuming, *arguendo*, that the newspaper writings are properly before us, it is undeniably clear that the news articles were never presented to the trial court. In case authorities involving adverse *pretrial* publicity, it has been held that where the facts concerning the newspaper publicity were known to the defendant at the beginning of the trial, and yet no objection to the proceedings was voiced by the defendant, nor was any motion for change of venue made at any time, a defendant is not in a position to claim on appeal that it was

impossible for him to secure a fair trial by an unbiased jury. (*People* v. *Cook*, 39 Cal.2d 496, 499-500 [247 P.2d 567]; *People* v. *Magee*, 217 Cal.App.2d 443, 473 [31 Cal.Rptr. 658].) The same rule is similarly applicable in cases involving adverse *trial* publicity. (*People* v. *Walker*, 247 Cal.App.2d 554, 563 [55 Cal.Rptr. 726], U.S. cert. den. 389 U.S. 824 [19 L.Ed.2d 77, 88 S.Ct. 60].) A defendant may not claim for the first time on appeal that he was deprived of a fair trial before an unbiased jury because of newspaper publicity where, with full knowledge of the publicity, he made no objection and failed to move for a change of venue. (*People* v. *Walker*, *supra*.) ▆▆ In the case before us, in addition to raising the issue for the first time on appeal, defendant has failed to show that the jurors read the newspaper articles or that they were influenced or prejudiced thereby. (*People* v. *Santo*, 43 Cal.2d 319, 331 [273 P.2d 249]; *People* v. *Gomez*, 41 Cal.2d 150, 161-162 [258 P.2d 825]; see also *People* v. *Cook, supra,* 39 Cal.2d 496, 499-500.) Consequently, we are not now in a position to determine that adverse trial publicity might have influenced the jurors so as to have precluded the defendant from enjoying the benefits of a fair trial.

Defendant next maintains that the trial court erred in finding the prosecution's fingerprint identification expert to be qualified as an expert, and that the fingerprint expert's testimony was insufficient to identify the defendant's fingerprint on the cigarette lighter. However, the prosecution's witness certainly qualified as a fingerprint expert inasmuch as he had been on the staff of the F.B.I. from 1960-1965, and during his tenure with the federal agency, had consistently worked with the identification of latent prints. ▆▆ The trial court's determination as to an expert's qualification will not be disturbed on appeal unless there has been a clear abuse of discretion. (*People* v. *Busch*, 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314]; *People* v. *Murray*, 247 Cal.App.2d 730, 735 [56 Cal.Rptr. 21].) ▆▆ Here, the witness had identified thousands of fingerprints and had the training and experience necessary to qualify as an expert. Once the trial court determined that the witness was an expert, the witness was certainly entitled to give his opinion to the effect that the fingerprint found on the cigarette lighter was that of the defendant. The print found on the lighter and the defendant's print had numerous similar points. The weight to be given to the expert's opinion was a matter for the jury's

determination. (*People* v. *Abner*, 209 Cal.App.2d 484, 490 [25 Cal.Rptr. 882] ; Pen. Code, § 1127b.)

Fingerprint evidence constitutes the strongest proof of identity and is ordinarily sufficient alone to identify the defendant. (*People* v. *Riser*, 47 Cal.2d 566, 589 [305 P.2d 1] ; *People* v. *Lindsay*, 227 Cal.App.2d 482, 496 [38 Cal.Rptr. 755].) Moreover, it should be emphasized that the fingerprint was not the only evidence connecting the defendant with the commission of the crime, but other factors were undoubtedly paramount in enabling the jury to arrive at a verdict of guilty. The victim's sister was an eyewitness and positively identified the defendant, and the victim's blood was discovered on the defendant's shoes and socks.

Defendant next contends that the photographs of the victim's residence, which encompassed the front of the house, the entrance hallway, and the bedroom, were admitted in evidence without proper foundation. However, this point lacks validity inasmuch as the photographer who took the pictures, as well as an investigating officer who visited the premises, testified that the photographs correctly represented the exterior and interior of the home. While the testimony of the photographer is not necessary to establish admissibility of a photograph (*People* v. *Samuels*, 250 Cal.App.2d 501, 512 [58 Cal.Rptr. 439] ; *People* v. *Doggett*, 83 Cal.App.2d 405, 409 [188 P.2d 792]), and all that is required is testimony of a witness that the photograph is a correct representation of the object it portrays (*People* v. *Bowley*, 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178]), in the matter under review, both the photographer and the police officer established that the photos accurately represented the scenes depicted.

Defendant next contends that the photographs were introduced for the sole purpose of arousing the sympathy of the jury because the photos of the entrance hall and bedroom demonstrated that these areas were splattered with blood. The test for the admissibility of allegedly gruesome photographs is whether the probative value of the evidence outweighs the inflammatory effect it may have. (*People* v. *Mathis*, 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65], U.S. cert. den. 385 U.S. 857 [17 L.Ed.2d 84, 87 S.Ct. 105] ; *People* v. *Harrison*, 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665] ; *People* v. *Love*, 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705].) The photographs involved herein were in no sense ghastly, and the pictures had probative value in that they furnished

the jury with an accurate representation of the interior of the residence where the crime occurred. Furthermore, the pictorial view of the blood on the floor may have assisted the jury in determining the manner in which the blood could have splattered on the shoes of the victim's attacker and explained the presence of the blood on the shoes and socks of the defendant.

In conclusion, defendant charges that the trial court improperly admitted the evidence to the effect that the defendant consented to the search of his residence, and that the evidence obtained as a result of the search was therefore inadmissible. The essence of defendant's argument is that under the cautionary rules adopted in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], law enforcement agents are required to inform the defendant that he has a right to refuse to grant consent to a search.

Following the defendant's arrest, he was fully advised of his rights to counsel and to remain silent, and he was also asked if he wished to talk to an attorney. Defendant stated he did not desire to speak to an attorney and then indicated he had no objection to a search of his residence. "There is no requirement in the law that an officer shall first advise a person of his constitutional rights and of his right to refuse to grant a consent to a search before the officer seeks a valid consent from the person to conduct a particular search." (*People* v. *Chaddock*, 249 Cal.App.2d 483, 485 [57 Cal.Rptr. 582]; *People* v. *Roberts*, 246 Cal.App.2d 715, 728-729 [55 Cal. Rptr. 62].) Finally, defendant offered no objection when the items of clothing were offered in evidence, and his failure to object to the admission of the evidence on the ground of noncompliance with *Miranda*, where the trial occurred after the decision in *Miranda*, precludes his raising the issue on appeal. (*People* v. *Taylor*, 253 Cal.App.2d 574, 576 [61 Cal.Rptr. 638].)

The judgment of conviction is affirmed.

Tamura, J., concurred.

A petition for a rehearing was denied February 2, 1968, and appellant's petition for a hearing by the Supreme Court was denied March 13, 1968.